MICHAEL D. POGUE, ISB No. 6518
GRAVIS LAW, PLLC
P.O. Box 3020
Sun Valley, Idaho 83353-3020
Telephone: (208) 290-9000
Email: MPogue@gravislaw.com

*Attorney for Plaintiff William David Wilcox*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILLIAM DAVID WILCOX,<br><br>     *Plaintiff,*<br><br>v.<br><br>CAROLINA DIAZ-SILVA and<br>ALBERT S. WATKINS,<br><br>     *Defendants.* | Case No. _____<br><br>**COMPLAINT FOR<br>DEFAMATION PER SE**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff William David Wilcox ("Wilcox" or "Plaintiff") alleges as follows against

Defendants Carolina Diaz-Silva ("Diaz-Silva") and Albert S. Watkins ("Watkins") (collectively,

"Defendants"):

**PARTIES, JURISDICTION, AND VENUE**

1. Diaz-Silva is an individual domiciled in Missouri and is a citizen of Missouri.

2. Watkins is an individual domiciled in Missouri and is a citizen of Missouri.

3. Wilcox is an individual domiciled in Idaho and is a citizen of Idaho.

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete

diversity exists between Wilcox and Defendants, and the amount in controversy exceeds

$75,000, exclusive of interest and costs.

COMPLAINT - PAGE 1

5. This Court has personal jurisdiction over Diaz-Silva under Idaho Code § 5-514(b) and the Due Process Clause because Diaz-Silva intentionally directed tortious conduct into Idaho by placing a defamatory voice call from Missouri to an Idaho-based household caretaker, knowing that the publication and resulting injury would occur in Idaho.

6. This Court has personal jurisdiction over Watkins under Idaho Code § 5-514(b) and the Due Process Clause because Watkins intentionally directed, authorized, and caused the defamatory publication in Idaho. As alleged below, Watkins obtained Doris Rojas's private contact information, supplied the defamatory and outrageous content to Diaz-Silva, and used Diaz-Silva as his proxy to transmit the accusations and threats to Rojas in Idaho. Further, Watkins deputized Diaz-Silva to act as his agent. He obtained Doris Rojas's private contact information, dictated the defamatory message, and directed Diaz-Silva to execute the call.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Wilcox's claims occurred in Idaho, including Defendants' targeted publication of defamatory statements to Rojas while she was located in Blaine County, Idaho, Defendants' effort to destabilize Wilcox's Idaho household and childcare arrangements, and the resulting injury to Wilcox in this District.

## COMMON ALLEGATIONS

### *Background and Motive*

8. Wilcox is the current executive chairman of a publicly traded company and has managed several commercial enterprises at all times relevant to this Complaint.

9. In early 2025, Wilcox's companies engaged in merger negotiations with a corporate counterparty represented by Watkins.

10. During those negotiations, Watkins sought a lucrative executive position within the

proposed post-merger public entity.

11. In or around June 2025, Wilcox determined that Watkins was unsuitable for that role and rejected Watkins's candidacy.

12. After Wilcox rejected Watkins, the contemplated transaction did not close, and the relationship between Wilcox and Watkins deteriorated.

13. On information and belief, Watkins thereafter developed personal and professional animus toward Wilcox and sought opportunities to harass, embarrass, and destabilize him.

### *Access to Wilcox's Household Caretaker*

14. At all relevant times, Doris Rojas provided resident childcare and household caretaker services for Wilcox's minor daughter at Wilcox's household in Hailey, Idaho. She is also an important witness in a pending child-custody proceeding between Wilcox and his former partner.

15. Rojas was not involved in any commercial dispute between Wilcox and Watkins, and she had no connection to the failed business transaction described above.

16. Rojas's cellular phone number was private and was not publicly available to Watkins through any legitimate personal relationship with Rojas.

17. Watkins had never met Rojas and had no independent basis to possess Rojas's private contact information.

18. On information and belief, Watkins obtained Rojas's private cellular phone number through a person who had prior access to Wilcox's household and Rojas's contact information.

19. Watkins then enlisted Diaz-Silva, a Spanish speaker and Watkins's former spouse, to contact Rojas and publish the accusations described below.

20. Watkins supplied Diaz-Silva with the substance of the accusations and directed, authorized, or intended Diaz-Silva to present those accusations to Rojas as factual warnings

COMPLAINT - PAGE 3

about Wilcox. In so doing, Watkins deputized Diaz-Silva to act as his agent. Watkins directed the precise parameters of the assignment: the target (Rojas), the medium (an anonymous call), and the message (the accusations against Wilcox). Diaz-Silva, in turn, accepted this undertaking. She agreed to serve as Watkins's proxy, acting subject to his direction, to execute his campaign against Wilcox. In placing the September 5 call into Idaho, Diaz-Silva operated squarely within the scope of this agency relationship.

### *The September 5, 2025 Defamatory and Outrageous Call*

21. On September 5, 2025, Diaz-Silva placed a voice call from Missouri to Rojas in Idaho.

22. Diaz-Silva intentionally blocked her caller identification and spoke in Spanish so that Rojas would understand the message while Diaz-Silva concealed her identity.

23. Diaz-Silva knew that Rojas was located in Idaho and that the call was directed to Rojas while Rojas was providing childcare and household services at Wilcox's Idaho household.

24. During the call, Diaz-Silva published false statements of fact concerning Wilcox to Rojas.

25. In substance, Diaz-Silva told Rojas that:

a.  Wilcox routinely abuses women;

b.  Wilcox is a kidnapper who previously held the mother of his child captive for months on a ranch in Ketchum, Idaho;

c.  Wilcox has held people against their will in the past;

d.  Wilcox trafficked Rojas into the United States to force her to work against her will; and

e.  Because of Wilcox's conduct, Rojas faced immediate physical and legal danger, including the risk that Immigration and Customs Enforcement could raid the property at any moment and deport her.

26. Diaz-Silva then directed Rojas to leave Wilcox's Hailey, Idaho household immediately, warning Rojas that remaining there jeopardized her physical safety and legal status. By commanding Rojas to flee, Defendants sought not only to shatter household stability but also to sabotage Wilcox's position in the pending custody litigation.

27. Diaz-Silva did not know Wilcox, did not know Rojas, and had no personal knowledge supporting the accusations she published to Rojas.

28. Diaz-Silva made no reasonable effort to verify the accusations before publishing them.

29. After the call, subpoenaed telecommunications records identified the calling number as a Missouri number registered to Diaz-Silva and the recipient number as Rojas's Idaho number.

30. After Diaz-Silva was identified, she admitted that she placed the call to Rojas, that she did not know Wilcox or Rojas, that she had no independent knowledge supporting the accusations, and that she spoke from information supplied by Watkins.

31. Watkins independently published false statements of fact concerning Wilcox to Diaz-Silva, including that Wilcox routinely abuses women, held a woman captive on a ranch in Ketchum, and trafficked undocumented laborers.

32. Watkins made those statements to Diaz-Silva with the specific intent that Diaz-Silva would adopt and republish them to Rojas in Idaho, frighten Rojas, and induce her to leave Wilcox's household.

33. Diaz-Silva assented to that objective, knowingly adopted Watkins's statements for purposes of the call, and republished them to Rojas as factual accusations and warnings, despite lacking personal knowledge and having made no reasonable effort to verify them.

34. Defendants acted jointly, in concert, and pursuant to their preexisting agreement and common plan. Watkins supplied the accusations described in paragraphs 25 and 31, obtained or

COMPLAINT - PAGE 5

caused the acquisition of Rojas's private contact information, selected the target and objective, and directed or authorized publication of those accusations. Diaz-Silva accepted her assigned role, placed the call, concealed her identity and caller identification, and published the statements to Rojas in Idaho. Each act furthered and helped accomplish the shared objective; Diaz-Silva's concealment also obscured the source of the accusations and Defendants' coordination.

35. The call and Watkins's instructions to Diaz-Silva were not made in a pleading, deposition, hearing, mediation, court filing, attorney-client communication, attorney correspondence, law-enforcement report, witness interview, or other communication made in the course of a judicial proceeding.

36. Diaz-Silva was not acting as counsel, client, investigator, interpreter, witness, court officer, or litigation representative when she called Rojas.

37. The purpose and effect of the call was to intimidate a private household caretaker into fleeing Wilcox's Idaho household and to damage Wilcox personally and professionally.

*Falsity, Malice, and Injury*

38. Each accusation described above was false when made and remains false.

39. Wilcox has never abused women.

40. Wilcox has never kidnapped or unlawfully confined the mother of his child or any other person.

41. Wilcox has never held anyone against his or her will.

42. Wilcox did not traffic Rojas into the United States and did not force Rojas to work against her will.

43. Rojas voluntarily provided childcare and household services and was never subjected by Wilcox to human trafficking, forced labor, coercion, or unlawful confinement.

COMPLAINT - PAGE 6

44. Defendants knew the statements were false or acted with reckless disregard for their truth or falsity, including by consciously disregarding obvious reasons to doubt the accusations and deliberately avoiding verification before publication.

45. Watkins knew he lacked a reliable factual basis for the accusations described in paragraphs 25 and 31. Nevertheless, motivated by animus and intending republication, Watkins supplied those accusations to Diaz-Silva as facts, selected an uninvolved household caretaker as the recipient, and used an intermediary and anonymous call to place the accusations into Wilcox's Idaho household.

46. Diaz-Silva knew that she did not know Wilcox or Rojas, had no personal knowledge of the alleged events, had not verified the accusations, and was receiving them from Watkins for the purpose of a targeted call. Despite those obvious reasons to doubt the accusations, she agreed to and did publish them as factual warnings to Rojas.

47. Defendants' use of an anonymous, blocked-number, Spanish-language call to a private household caretaker, rather than a direct and accountable communication, further demonstrates knowledge of falsity or reckless disregard for the truth.

48. The accusations that Wilcox committed kidnapping, unlawful confinement, human trafficking, and forced labor are defamatory per se because they falsely impute serious criminal conduct. The remaining statements are defamatory based on their factual content and context. To the extent supported by the evidence, the statements also impute conduct incompatible with Wilcox's profession, office, and business responsibilities.

49. The statements were of and concerning Wilcox, and Rojas reasonably understood the statements to refer to Wilcox.

50. As a direct and proximate result of Defendants' publications, Wilcox suffered presumed

COMPLAINT - PAGE 7

injury to reputation and standing and actual damages to be presented at trial.

*Conduct Directed at Wilcox*

52. Defendants' conduct was specifically directed at Wilcox. Although Defendants used Rojas as the immediate recipient of the call, they selected Rojas because she lived and worked in Wilcox's Idaho household, cared for Wilcox's minor daughter, and was essential to Wilcox's household and childcare arrangements.

53. Defendants intended, desired, or were substantially certain that their conduct would affect Wilcox personally by frightening Rojas, destabilizing Wilcox's household, disrupting Wilcox's childcare arrangements, and damaging Wilcox's personal and professional standing.

54. Defendants' conduct was not limited to ordinary criticism or an effort to assert a legal right in a permissible manner. It involved an anonymous, blocked-number call to a private household caretaker, false accusations of kidnapping, human trafficking, forced labor, unlawful confinement, and abuse, and warnings that Rojas faced imminent physical and immigration-related danger if she remained at Wilcox's household.

## COUNT I
## DEFAMATION, INCLUDING DEFAMATION PER SE
### (Against All Defendants)

55. Wilcox incorporates by reference paragraphs 1 through 54 as though fully set forth herein.

56. Diaz-Silva published false and defamatory statements of fact concerning Wilcox to Rojas in Idaho.

57. Watkins published false and defamatory statements of fact concerning Wilcox to Diaz-Silva and, by supplying the accusations described in paragraphs 25 and 31 and directing or authorizing their republication, intentionally caused and intended the republication of those

COMPLAINT - PAGE 8

accusations to Rojas in Idaho.

58. The statements were of and concerning Wilcox and were reasonably understood by their recipients to refer to Wilcox.

59. The statements were false when made.

60. The statements were not protected opinion, rhetorical hyperbole, or substantially true statements; they were factual accusations that Wilcox committed serious crimes and engaged in serious misconduct.

61. The accusations that Wilcox committed kidnapping, unlawful confinement, human trafficking, and forced labor were defamatory per se because they imputed serious criminal conduct. The remaining actionable statements were defamatory based on their factual content and context and, to the extent supported by the evidence, imputed conduct incompatible with Wilcox's profession, office, and business responsibilities.

62. Defendants' publications were not privileged.

63. Defendants acted with actual malice because they knew the statements were false or acted with reckless disregard for their truth or falsity.

64. Because the statements constitute defamation per se, Wilcox is entitled to presumed damages without pleading or proving special damages.

65. Wilcox is also entitled to recover actual, general, and special damages, including injury to reputation, personal humiliation and distress, disruption to household and childcare arrangements, lost work time and business disruption, and expenses incurred to investigate, respond to, and mitigate Defendants' defamatory publications.

66. Diaz-Silva is directly liable for her publication to Rojas, and Watkins is directly liable for his publication to Diaz-Silva and for intentionally causing and authorizing the foreseeable

republication to Rojas. Plaintiff alternatively seeks attribution and joint-and-several liability as alleged below.

## DERIVATIVE AND JOINT-AND-SEVERAL LIABILITY

67. Wilcox incorporates by reference paragraphs 1 through 66 as though fully set forth herein.

68. Plaintiff pleads the agreement, concerted action, and limited-purpose agency allegations as alternative grounds to attribute conduct and determine responsibility for damages caused by the tort alleged in Count I (not a separate cause of action).

69. Each Defendant is directly liable for his or her own tortious publication and conduct as alleged above. Watkins is also directly liable for intentionally directing, authorizing, and causing the republication to Rojas.

70. Before and at the time of the September 5, 2025 call, Defendants agreed and combined to accomplish the unlawful objective of publishing false and defamatory accusations about Wilcox to Rojas and inducing her to leave Wilcox's household, or, alternatively, to accomplish their objective through unlawful means. Watkins and Diaz-Silva knowingly accepted assigned roles and committed acts in furtherance of the agreement.

71. Defendants pursued a common plan or design that resulted in the commission of intentional or reckless tortious acts, including the defamatory publications alleged in Count I. They therefore acted in concert within the meaning of Idaho Code § 6-803(5).

72. As a result, each Defendant is jointly and severally liable under Idaho Code § 6-803(5) for the fault of the other and for the damages proximately caused by the underlying defamation.

73. Alternatively, Watkins manifested that Diaz-Silva would act on his behalf and subject to his direction for the purpose of contacting Rojas and delivering the assigned accusations; Diaz-

Silva assented; and she acted within the scope of that undertaking when she placed the call, concealed her identity, and published the accusations.

74. Watkins is responsible for the fault attributable to Diaz-Silva's conduct within the scope of that agency and is jointly and severally liable for the damages proximately caused by the underlying defamation.

75. Defendants' agreement and coordinated acts constitute a civil conspiracy as bearing on attribution of acts, evidence, and the persons responsible for the underlying tort.

### PRAYER FOR RELIEF

WHEREFORE, Wilcox respectfully requests that the Court enter judgment in his favor and against Defendants Carolina Diaz-Silva and Albert S. Watkins and grant the following relief:

A. Judgment in Wilcox's favor on Count I for defamation, including defamation per se against each Defendant;

B. A determination under Idaho Code § 6-803(5) that Defendants are jointly and severally liable because they acted in concert or, alternatively, that Watkins is jointly and severally liable for Diaz-Silva's conduct within the scope of her limited-purpose agency;

C. An award of presumed damages on Count I and actual, general, compensatory, and special damages on all applicable claims in an amount to be proven at trial;

D. Pre-judgment and post-judgment interest to the extent permitted by law;

E. Costs of suit and reasonable attorneys' fees to the extent permitted by statute, rule, contract, or other applicable law; and

F. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

DATED: July 15, 2026

GRAVIS LAW, PLLC

_/s/Michael D. Pogue _____
Michael D. Pogue
Attorney for Plaintiff William David Wilcox

COMPLAINT - PAGE 12